# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SOUTHWESTERN BELL TELEPHONE COMPANY D/B/A AT&T TEXAS, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:09-CV-1548 |
| F. CARY FITCH D/B/A AFFORDABLE TELECOM, | § § § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff is Southwestern Bell Telephone Company d/b/a AT&T Texas ("AT&T Texas") and Defendant is F. Cary Fitch d/b/a Affordable Telecom ("Affordable"). Each party alleges that the other has failed to pay money required under their June 2007 Two-Way CMRS Interconnection Agreement ("2007 Agreement"). Pending before the Court is AT&T Texas's Motion for Summary Judgment [Doc. # 42] ("AT&T Texas's Motion") to which Affordable has responded [Doc. # 45], and AT&T Texas has replied [Doc. # 46].[1] Also pending before the Court is Affordable's

---

[1] Affordable has also filed a "Motion to Strike New Evidence and Arguments Raised in Plaintiff's Reply, or Alternatively, Motion for Leave to File Sur-Reply" [Doc. # 49]. AT&T Texas responded [Doc. # 50] that it was not opposed to Affordable's
(continued...)

Motion for Partial Summary Judgment [Doc. # 43] ("Affordable's Motion"), to which

AT&T Texas has responded [Doc. # 44], and Affordable has replied [Doc. # 47].  The

Court heard oral argument on these summary judgment motions on May 18, 2011

[Doc. # 59].  The motions are now ripe for decision.  Having considered the parties'

briefing, the applicable legal authorities, and all matters of record, the Court concludes

that AT&T Texas's Motion should be **granted in part and denied in part** and

Affordable's Motion should be **denied.**

## I.    BACKGROUND

### A.    Regulatory Background

The Telecommunications Act of 1996, 47 U.S.C. § 151 *et. seq.* (the "1996

Telecom Act") requires incumbent local exchange carriers ("ILECs"), such as AT&T

Texas, to provide "interconnection with the [ILEC's] network" for "the facilities and

equipment of any requesting telecommunications carrier."  47 U.S.C. § 251(c)(2).

This interconnection is accomplished through "interconnection agreements" with the

competitive local exchange carriers ("CLECs") even though they compete with the

ILEC providing the interconnection.   CLECs and ILECs all provide landline

---

[1]    (...continued)
       filing its sur-reply and addressed the merits of the sur-reply.  Accordingly, the Court
       **denies** Affordable's Motion to Strike and **grants** Affordable's Motion to File Sur-
       Reply.  The Court will consider the arguments and exhibits contained in these
       documents.

telecommunications services.

The Federal Communications Commission ("FCC") has extended the right to establish interconnection agreements under 47 U.S.C. §§ 251 and 252 to Commercial Mobile Radio Service ("CMRS")[2] carriers[3] that provide wireless services, such as paging or cellular telephone services. ILECs and CMRS carriers physically interconnect their networks pursuant to the terms of their interconnection agreements. These interconnections allow CMRS carriers and ILECs to exchange traffic over their networks for delivery to their end users (*i.e.*, the caller and the called/receiving party).

The CLECs and ILECs are permitted to and do charge each other fees for the services they render to each other pursuant to the interconnection agreements. The prices to be paid for the routing of the calls are established in the interconnection agreements.

## B.      **Prior Dealings Between the Parties**

In 2001, Fitch obtained a one-way CMRS license that allowed him to provide

---

[2]     CMRS is "[a]n FCC designation for any carrier or licensee whose wireless network is connected to the public switched telephone network and/or is operated for profit." NEWTON'S TELECOM DICTIONARY 298 (25th ed. 2009). The public switched telephone network ("PSTN") "usually refers to the worldwide voice telephone network accessible to all those with telephones and access privileges." *Id.* at 902.

[3]     First Report and Order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, No. 96-98, 1996 WL 452885, 11 F.C.C.R. 15,499, ¶ 1023 (Aug. 8, 1996), *reversed on other grounds*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999); *see also* 47 C.F.R. § 20.11(e).

paging services.  AT&T Texas then began delivering traffic to Affordable (Fitch's sole proprietorship) under an interim agreement.[4]  Affordable then sought a formal interconnection agreement from the Public Utility Commission of Texas ("PUCT").[5]  On July 15, 2005, the PUCT issued an arbitration award, which as modified, dictated the terms of that interconnection agreement.[6]

Affordable had sought from the PUCT authority to provide not only paging services through his interconnection agreement with AT&T Texas but also to use those interconnection trunks and facilities to allow customers to call a dial-up Internet access service that Affordable offered under the name "USA Wide.net."[7]  In this PUCT proceeding, Affordable thus sought to serve as an "Internet Service Provider" ("ISP") and sought to use its interconnection with AT&T Texas to carry Internet access traffic.[8]  The FCC has recognized that ISPs "are end users of

---

[4]    Deposition of F. Cary Fitch, Exh. G to AT&T Texas's Motion [Doc. # 42] ("Fitch Depo."), at 110.

[5]    *See* Excerpts from PUCT Arbitration Award and Order Approving Same with Modifications, Exh. C to AT&T Texas's Motion [Doc. # 42] ("Arbitration Award"), at 1.  The 1996 Telecom Act authorizes the PUCT and other state commissions to arbitrate open issues between an ILEC and a requesting telecommunications carrier. *See id.*; 47 U.S.C. § 252(b).

[6]    *See generally* Arbitration Award.

[7]    Arbitration Award, at 6-10.

[8]    An "Internet Service Provider" or ISP is "[a] vendor who provides access for customers (companies and private individuals) to the Internet and the World Wide
(continued...)

telecommunications services that are required to purchase LEC business lines" from

local exchange carriers like AT&T Texas in order to receive calls to their dial-up

Internet service.[9]   Affordable sought to avoid this requirement through the PUCT

proceeding.

Relying on 47 C.F.R. § 51.100(b),[10] the PUCT rejected Affordable's claims that

---

[8]        (...continued)
Web.  The ISP also typically provides a core group of Internet utilities and services
like E-mail, News Group Readers and sometimes weather reports and local restaurant
reviews.  The user typically reaches his ISP by either dialing-up with their own
computer, modem and phone line, or over a dedicated line installed by a telephone
company."  NEWTON'S TELECOM DICTIONARY 610 (25th ed. 2009).

[9]        *See Fitch v. Pub. Util. Comm'n of Texas*, 261 F. App'x 788, 793 (5th Cir. 2008)
(citing *In the Matter of Implementation of the Local Competition Provisions in the
Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3690, ¶ 4, 1999 WL 98037 (Rel.
Feb. 26, 1999), *vacated on other grounds*, *Bell Atl. Tel. Co. v. FCC*, 206 F.3d 1 (D.C.
Cir. 2000)).

[10]       47 C.F.R. § 51.100(b) states:

> A telecommunications carrier that has interconnected or gained access
> under Sections 251(a)(1), 251(c)(2), 251(c)(3) of the Act, may offer
> information services through the same arrangement, so long as it is
> offering telecommunications services through the same arrangement as
> well.

"Telecommunications service" means "the offering of telecommunications for a fee
directly to the public, or to such classes of users as to be effectively available directly
to the public, regardless of the facilities used."   47 U.S.C. § 153(46).
"Telecommunications" is defined as "the transmission, between or among points
specified by the user, of information of the user's choosing, without change in the
form or content of the information as sent and received."  47 U.S.C. § 153(43).

In contrast, an "information service" offers the capability for "generating, acquiring,
storing, transforming, processing, retrieving, utilizing, or making available
(continued...)

it could use its paging interconnection with AT&T Texas to carry Internet access traffic because Affordable did not offer telecommunications service "through" interconnection facilities; rather, it merely transmitted radio signals to activate its pagers.[11]   The PUCT arbitrators explained that "47 C.F.R. § 51.100(b) allows the offering of information service through an interconnection facility, but only as an incident to the telecommunications service for which the carrier obtained the interconnection facility."[12]   The PUCT arbitrators concluded that Affordable was only authorized to provide paging services, and "consequently [it] may not receive any traffic other than paging traffic through the interconnection facility."[13]   Affordable appealed the PUCT's decision to the federal district court, which affirmed the PUCT.[14]   The Fifth Circuit also affirmed.[15]   Affordable nevertheless continued to operate as an

---

[10]      (...continued)
information via telecommunications," but does not include providing telecommunications itself.   47 U.S.C. § 153(20).

[11]      *See* Arbitration Award, at 22-31.

[12]      *Id.* at 29.

[13]      *Id.* at 31.

[14]      *See Fitch v. Pub. Util. Comm'n of Texas*, No. A-06-CA-120-SS (W.D. Tex. Dec. 12, 2006), attached as Exh. D to AT&T's Motion [Doc. # 42].

[15]      *See Fitch v. Pub. Util. Comm'n of Texas*, 261 F. App'x 788 (5th Cir. 2008).

ISP for approximately one year after the PUCT's decision.[16]

## C.   Formation of the 2007 Agreement

At some point, Affordable obtained a two-way CMRS license from the FCC, which allows the company to both send and receive wireless radio communications within a limited bandwidth.[17]   Affordable then sought to adopt the interconnection agreement between Cingular and AT&T Texas.[18]   AT&T Texas was required by law to let any "requesting telecommunications carrier" opt into this agreement.   *See* 47 U.S.C. § 252(i); 47 C.F.R. § 51.809.   AT&T Texas initially resisted Affordable's request to adopt that agreement, expressing concern that Affordable would use this new agreement to improperly provide information services, just as Affordable had done under the one-way paging agreement.[19]   Affordable's counsel represented that Affordable acquired his two-way CMRS license to comply with the PUCT's decision.[20]   On June 22, 2007, AT&T Texas and Affordable formally entered into an

---

[16]   Fitch Depo., at 127-28.  Affordable later separately incorporated the ISP business as Affordable USAWide, which entity is now a customer of Affordable.  *Id.*; *see also* Information Regarding Specific Customers, Exh. H to AT&T Texas's Motion [Doc. # 42] ("Customer List"), at 2.

[17]   *See id.* at 39-40; *see also* Exh. R to AT&T's Motion [Doc. # 42].

[18]   *See* Exh. I to AT&T's Motion [Doc. # 42].

[19]   *See id.*

[20]   *See id.* at 2.

interconnection agreement ("2007 Agreement"), which the PUCT approved.[21]  The

2007 Agreement called for the parties to "connect their facilities and interchange

traffic . . . as telecommunications carriers for the purpose of offering wireless to

wireline or wireline to wireless communications service to their respective end users

. . . ."[22]

###   D.   **The Instant Lawsuit**

Several billing and other disputes have arisen between the parties.  AT&T

Texas claims that Affordable has failed to pay for services under the 2007 Agreement.

AT&T Texas states that it provided facilities and services pursuant to the 2007

Agreement and submitted charges to Affordable but that, despite repeated demands

for payment, Affordable has refused to remit the sums due.  AT&T Texas therefore

brings claims for breach of contract.[23]

Affordable disputes many of AT&T Texas's billings and further alleges that

AT&T Texas has refused to pay certain compensation that Affordable claims is due.

---

[21]    *See generally* Agreement for Interconnection and Reciprocal Compensation by and between F. Cary Fitch, d/b/a Affordable Telecom and Southwestern Bell Telephone, L.P. d/b/a AT&T Texas, Exh. A to AT&T Texas's Motion [Doc. # 42] ("2007 Agreement").

[22]    2007 Agreement, at 1 (Agreement's recitals).

[23]    AT&T Texas also sued for quantum meruit and anticipatory breach, but has withdrawn those claims.  *See* AT&T Texas's Reply [Doc. # 46], at 29.  The Court deems those claims abandoned and dismisses them with prejudice.

Affordable brings counterclaims against AT&T Texas for breach of contract, declaratory judgment, and violations of the Telecom Act.[24]

AT&T Texas alleges that in the months preceding the 2007 Agreement, Affordable represented to the FCC that it would be providing not only "information services" but also "telecommunications services,"[25] such that it was entitled to "interconnection" under FCC rules.  AT&T Texas states that these representations by Affordable were key to AT&T Texas's willingness to enter the 2007 Agreement, and to the PUCT's approval of the 2007 Agreement, but these representations were materially false.

Affordable concedes that more than ninety percent of its business comes from its ISP customers or "Internet service provider aggregator customers"[26] (collectively referred to herein as "ISPs," "ISP customers," or "dial-up ISP customers").

---

[24]   Affordable also counterclaims for "Misrepresentations Regarding Intent to Correct Admitted Billing Errors."  Affordable alleges that AT&T Texas represented that it would stop assessing charges related to facilities and trunks in the San Antonio area and that AT&T Texas would issue credits to this account.  At oral argument, Affordable indicated it would withdraw this claim if the billing errors were corrected. The Court accordingly declines to decide this issue at this time.  Finally, Affordable also counterclaims for fraud related to AT&T Texas's setting up the network architecture in the Houston area.  This claim is discussed *infra* at Section III.C.

[25]   *See* note 10 *supra* (defining "telecommunications services" and "information services").

[26]   Fitch Depo., at 97.

Affordable defines these customers as "receiv[ing] telecommunication service via delivery of calls from the PSTN to equipment owned by [the ISP, Affordable's customer].  [Affordable] transports and terminates calls that originate on the PSTN to the [ISP] customer-designated demarcation."[27]  The PSTN, *i.e.*, the public switched telephone network, is "the worldwide voice telephone network accessible to all those with telephones and access privileges."[28]  Affordable concedes its ISP customers provide "dial-up Internet service"[29] and that Affordable provides only "PRI circuits"[30] to the ISPs.  Affordable concedes this service is essentially providing its dial-up ISP customers with business lines that they would otherwise have to purchase from

---

[27]  *See id.*, at 43; Customer List, at 2-3.

[28]  NEWTON'S TELECOM DICTIONARY 902 (25th ed. 2009).

[29]  *See* Fitch Depo, at 44.  "Dial-up Internet service" or dial up Internet access is where a wireline (*i.e.*, landline) telephone customer dials a local ISP via a local wireline telephone number and uses a modem and standard telephone to connect to the Internet.  *See* NEWTON'S TELECOM DICTIONARY 363 (25th ed. 2009) (defining "dial up" and "dial up account").

[30]  *See id.* at 47, 49.  "Primary Rate Interface," or PRI, is "[a] digital access technology that allows for simultaneous, integrated voice and data capabilities over standard existing phone lines."  *See* Joint Glossary of All Technical Terminology [Doc. # 58] ("Joint Glossary"), at 17 (AT&T Texas's definition citing *XO Commc'ns Servs., Inc. v. S. Telecom, Inc.*, No. 05-3018, 2006 WL 1155946, at *1 (W.D. Ark. May 1, 2006)).  PRI circuits provide Affordable's customers with access to the Integrated Services Digital Network (ISDN), "a highly sophisticated enhancement of the traditional circuit-switched PSTN" that "supports access to any type of service (e.g. voice, data, and video)" for the simultaneous digital transmission of voice, video, data, and other network services.  *See* NEWTON'S TELECOM DICTIONARY 275, 624-25, 887 (25th ed. 2009) (defining "circuit," "ISDN," and "PRI").

LECs.[31]  Affordable's two-way wireless services under the June 2007 Agreement[32] are unrelated to the services it provides to the ISPs, and its dial-up ISP customers do not use the wireless spectrum.[33]    AT&T Texas alleges that this use of Affordable's interconnection is a breach of the 2007 Agreement.  Affordable disputes this characterization and seeks a declaration that Affordable is allowed to provide these services through his interconnection with AT&T Texas.  AT&T Texas also alleges that Affordable Telecom's representations to Plaintiff and the FCC, namely, its representations that it would provide telecommunications services in addition to information services, were false.  Based upon these allegations, AT&T Texas asserts a claim for fraud.[34]

---

[31]    *See* Fitch Depo., at 43-44, 47, 49 (describing Affordable's customers).  According to the FCC, "ISPs purchase analog and digital lines from local exchange carriers [LECs] to connect to their dial-in subscribers. . . . The ISP typically purchases business lines from a LEC, for which is pays a flat monthly fee."  *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3690, ¶ 4, 1999 WL 98037 (Rel. Feb. 26, 1999), *vacated on other grounds*, *Bell Atl. Tel. Co. v. FCC*, 206 F.3d 1 (D.C. Cir.2000)

[32]    Affordable has some customers that "receive telecommunications services via . . . CMRS facilities. [These customers] have voicemail capability, and communicate via either half-duplex ('walkie-talkie') means or bidirectional ('duplex') audio . . . . Some customers also have a more traditional 'paging' arrangement as defined in FCC rules, *e.g.*, a separate device that received coded messages only."  Customer List, at 2.

[33]    *See id.*, at 2.

[34]    AT&T Texas originally also sued for declaratory judgment and violation of the
(continued...)

The parties have filed cross-motions for summary judgment, which have been fully briefed and are ripe for decision.

## II.   STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).   "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

---

[34]      (...continued)
Telecom Act, but has withdrawn those claims. *See* AT&T Texas's Reply [Doc. # 46], at 29.  The Court deems those claims abandoned and dismisses them with prejudice.

The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003) (internal citation omitted). The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413). However, factual controversies are resolved in favor of the

non-movant "only 'when both parties have submitted evidence of contradictory facts.'"  *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994).  Likewise, "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment."  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  "A party cannot defeat summary judgment with 'only a scintilla of evidence.'"  *Delta & Pine Land Co.*, 530 F.3d at 399 (quoting *Little*, 37 F.3d at 1075).

Rather, a party must support any assertion that a fact cannot be or is genuinely disputed by "(a) citing to particular parts of materials in the record . . . ; or (b) showing that the materials cited do not establish the absence or present of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  FED. R. CIV. P. 56(c)(1).  Affidavits cannot defeat summary judgment unless they contain competent and otherwise admissible evidence.  FED. R. CIV. P. 56(c)(4).  A party's self-serving and unsupported statement in an affidavit will

not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000).

Further, "the court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Id.*

In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Rather, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may, *inter alia,* "(2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion  and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." FED. R. CIV. P. 56(e).

Finally, when evaluating cross-motions for summary judgment, the "[c]ross-motions must be considered separately, as each movant bears the burden of

establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998) ("WRIGHT")).  "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  WRIGHT, § 2720.

## III.   AT&T TEXAS'S MOTION

AT&T Texas moves for summary judgment that (i) AT&T Texas has properly billed Affordable according to the terms and conditions of the 2007 Agreement, (ii) AT&T Texas is entitled to recover approximately $1.8 million billed, (iii) AT&T Texas is not liable for usage charges that Affordable has billed to AT&T Texas, (iv) Affordable has breached the contract by misusing the interconnection when the connection is used for land-to-land calls to Affordable's dial-up ISP customers, (v) Affordable's fraud claim is barred as a matter of law, and (vi) that AT&T Texas is not liable for any of Affordable's counterclaims.[35]

### A.   AT&T Texas's Contract Claims

The elements of a claim for breach of contract are:  (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract;

---

[35]   *See* AT&T Texas's Motion [Doc. # 42], at 1-2, 25.

and (4) the plaintiff was damaged as a result of the breach.  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 288 (5th Cir. 2004); *SLT Dealer Group, Ltd. v. AmeriCredit Fin. Servs.*, 336 S.W.3d 822, 828 (Tex. App.-Houston [1st Dist.] 2011, no pet. h.); *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 615 (Tex.App.-Texarkana 2002, pet. denied); *Guzman v. Ugly Duckling Car Sales of Texas, L.L.P.*, 63 S.W.3d 522, 528 (Tex.App.-San Antonio 2001, pet. denied); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.App.-Houston [14th Dist.] 2000, no pet.).  A breach occurs when a party fails or refuses to do something he has promised to do.  *Townewest Homeowners Ass'n, Inc. v. Warner Commc'n Inc.*, 826 S.W.2d 638, 640 (Tex.App.-Houston [14th Dist.] 1992, no writ); *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.).  "Reliance is not required to prove a breach of contract."  *Nat'l W. Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 297 (Tex.App.-Austin 2002) *rev'd on other grounds*, 2005 WL 1186226 (Tex. 2005) (not released for publication).

A court must determine whether a contract is ambiguous as a matter of law. *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners*, 334 F.3d 423, 428 (5th Cir. 2003); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).  Determining whether ambiguity exists, the court must look at the

contract as a whole in light of the circumstances existing at the time of execution. *Instone Travel*, 334 F.3d at 431 (citing *In re El Paso Refinery, LP*, 302 F.3d 343, 353 (5th Cir. 2002)); *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993). "These circumstances include the commonly understood meaning in the industry of a specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material. *XCO Prod. Co. v. Jamison*, 194 S.W.3d 622, 627-628 (Tex.App.–Houston [14 Dist.], 2006, pet. denied). The terms of a contract are ambiguous if they are subject to two or more reasonable interpretations. *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998); *see also Cicciarella v. Amica Mut. Ins. Co.*, 66 F.3d 764, 768 (5th Cir. 1995) ("A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning.'" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))). On the other hand, if the terms of the contract can be given a definite or certain legal meaning, then the contract is not ambiguous. *H.E. Butt*, 150 F.3d at 529; *CBI Indus.*, 907 S.W.2d at 520.

The Court is to interpret the terms of an unambiguous contract as a matter of law. *Gonzales v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004); *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the

parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003), *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000), and *Coker*, 650 S.W.2d at 393 (Tex. 1983)).  "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (citing *J.M. Davidson, Inc.*, 128 S.W.3d at 229, and *Coker*, 650 S.W.2d at 393). "Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Id.* (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996), *W. Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953), and *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003)). "Language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987) (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)).

### 1.    AT&T Texas's Charges Billed to Affordable

AT&T Texas seeks to recover charges billed for facilities that AT&T Texas provided to Affordable under the 2007 Agreement to route Affordable's traffic. These facilities include one-way trunks that route traffic from AT&T Texas to Affordable ("Land-to-Mobile traffic"), one way trunks that route traffic from Affordable to AT&T Texas ("Mobile-to-Land traffic"), and two-way trunks that route traffic in both directions. AT&T Texas seeks to charge Affordable $1,536,678.00[36] for one-way trunks routing Land-to-Mobile traffic, $41,950.00 for one-way trunks routing Mobile-to-Land traffic, and $73,029.60 for two-way trunks that route traffic in both directions.

---

[36]    In its Motion for Summary Judgment, AT&T Texas states that Affordable owes $1,243,990.00 for Land-to-Mobile facilities in the Houston LATA and $370,271.60 for Land-to-Mobile facilities in the Austin LATA, for a total of $1,614,261.60. *See* AT&T Texas's Motion [Doc. # 42], at 8 (citing Declaration of Heather D. Lenhart, Exh. F to AT&T Texas's Motion [Doc. # 42] ("Lenhart Decl.")). The figures noted in AT&T Texas's Motion are not an accurate reflection of the summaries of AT&T Texas's charges to Affordable as of February, 2011, that are attached to Lenhart's Declaration.

The Land-to-Mobile facilities charges for the Houston LATA should be $1,239,436.00, which is $4,554.00 less than the $1,243,990.00 total included in AT&T Texas's Motion. *See* Lenhart Decl., at 6. AT&T Texas mistakenly added $4,554.00 to its Land-to-Mobile. The $4554.00 is the charge noted in Lenhart's summary for Mobile-to-Land facilities in the Houston LATA.

The Land-to-Mobile facilities charges for the Austin LATA should be $297,242, which is $73,029.60 less than the $370,271.60 total included in AT&T Texas's Motion. *See* Lenhart Decl., at 9. AT&T Texas mistakenly added $73,029.60 to its Land-to-Mobile calculation. The $73,029.60 is the charge noted in Lenhart's summary for Two-Way facilities in the Austin LATA.

The key disputed contract provisions are in Section 3.1 of the 2007 Agreement, which addresses the parties' respective responsibilities for Land-to-Mobile traffic and Mobile-to-Land traffic.

AT&T Texas also seeks to recover usage charges for transiting[37] and terminating traffic[38] to Affordable.[39]   AT&T Texas seeks to charge Affordable $32,949.93 in usage charges for transiting and terminating traffic that the parties

---

[37]   "Transiting charges" are "charges for one carrier transporting across its network to a third-party carrier the telecommunications traffic (calls) of another carrier." *See* Joint Glossary, at 23.  Transiting charges therefore apply when Affordable's customers use AT&T Texas's facilities to reach non-AT&T Texas customers. *See* AT&T's Motion [Doc. # 42], at 8.

[38]   "Termination charges" are "charges for delivery of one carrier's traffic (calls) to the customers of another carrier.  The latter carrier is the one assessing the charge." *See* Joint Glossary, at 22.  Affordable owes AT&T Texas termination charges for Mobile-to-Land calls from Affordable's customers that Affordable delivers to AT&T Texas and AT&T Texas "terminates" to its customers.  AT&T Texas would owe Affordable termination charges for any Land-to-Mobile calls from AT&T Texas's customers that AT&T Texas delivers to Affordable and Affordable "terminates" to his customers.  AT&T Texas disputes Affordable's usage charges for reasons which are discussed below. *See* Section III.A.2, *infra.*

[39]   AT&T Texas also seeks to recover prorated charges/credits in the amount of $98,405.22, *see* AT&T Texas's Motion [Doc. # 42], at 8, charges that Affordable does not address.  Affordable has waived any opposition to these charges.

Additionally, AT&T Texas seeks to recover $2,807.49 for providing 911 facilities.  AT&T Texas presents evidence that the 911 facilities charges are undisputed. *See* Exh. N to AT&T's Motion [Doc. # 42], at 1 ("We accept the charges for the "911" trunks on [BAN 710 083 0196 806] and either have or will soon pay them.").  Affordable has waived any opposition to these charges.

exchange.[40]

*Land-to-Mobile Facilities Charges.*– Section 3.1.2 of the 2007 Agreement addresses the parties' responsibilities for Land-to-Mobile traffic.   That Section provides:

3.1.2  <u>Land to Mobile Traffic</u>

3.1.2.1   AT&T TEXAS shall be responsible for the delivery of traffic from its network to the appropriate point of interconnection (within the serving wire center boundary of the end office in which the tandem, providing the Type 2A interconnection[,] is located . . . ) on its network for the transport and termination of such traffic by [Affordable] to a[n Affordable] end user.

3.1.2.2   Unless AT&T TEXAS elects to have [Affordable] or a third party provision facilities, AT&T TEXAS shall provide the physical plant facilities that interconnect AT&T TEXAS' point of interconnection with [Affordable]'s point of interconnection. AT&T TEXAS shall be responsible for the physical plant facilities to the appropriate point of interconnection (within the serving wire center boundary of the end office in which the tandem, providing the Type 2A interconnection[,] is located . . . ) on its network.[41]

---

[40]   Affordable does not dispute AT&T's usage charges anywhere in his briefing. Accordingly, Affordable has waived any opposition to these charges.

[41]   2007 Agreement, §§ 3.1.2.1, 3.1.2.2.  The omitted portions of these clauses refer to Type 1 interconnection, which Affordable does not use and which is not in issue in this case.

Pursuant to Section 2.4.1 of the 2007 Agreement, the rates Affordable must pay for facilities purchased from AT&T Texas "are specified in Section 7 of the inter or intrastate special access tariffs."

AT&T Texas argues that pursuant to Section 3.1.2.1, AT&T Texas is responsible for the costs of facilities used to route Land-to-Mobile traffic to Affordable, but only for the costs of delivering traffic within the serving wire center boundary of the end office in which the tandem providing the Type 2A interconnection is located.[42]  Affordable does not dispute that the word "responsible" as used in Section 3 of the 2007 Agreement means obligated to pay costs.[43]  The thrust of this aspect of the parties' billing dispute (*i.e.*, Land-to-Mobile traffic) is that AT&T Texas contends that Affordable must pay for facilities beyond the serving wire center boundary of the Type 2A tandem.

The 2007 Agreement defines "tandem" as "a switching system that provides a concentration and distribution function for originating or terminating traffic between end offices, other tandems, and Third Party Providers."[44]   The 2007 Agreement

---

[42]     *See* AT&T Texas's Motion [Doc. # 42], at 19.

[43]     *See generally* Affordable's Response [Doc. # 45].  Indeed, Affordable seems to adopt that meaning in his briefing.  *See id.* at 27 ("Affordable is not responsible for 70% of two-way facilities or trunks . . . .").

[44]     2007 Agreement, § 1, at p. 4.

defines an "end office" as "a local AT&T TEXAS switching point at which AT&T TEXAS end user station loops are originated and terminated for purposes of interconnection to each other and to the network."[45]  In other words, the end office is the connection between AT&T Texas and its customers, and the end offices are served by the tandem.  A "serving wire center" is the "wire center from which service is provided to the customer."[46]  Wire center boundaries define the geographic area in which all customers served by a given wire center are located.[47]  The unambiguous meaning of these terms is that traffic (a call) is "within" the "serving wire center boundary" only when the traffic originates within one of the end offices served by the tandem serving the end office where the call terminates, or more simply, when the call originates and terminates within the same wire center boundary.  Accordingly, AT&T Texas is only responsible for paying the costs of facilities used to transport traffic that originates within the wire center boundary of Affordable's Mobile Switching Centers ("MSCs").  In contrast, Affordable is responsible for paying the costs of facilities used to transport traffic that originates outside the wire center boundary of Affordable's

---

[45]     *Id.* § 1, at p. 2.

[46]     NEWTON'S TELECOM DICTIONARY 832 (24th ed. 2008); *see also*  47 C.F.R. § 69.2(rr) (defining "serving wire center" as "[t]he telephone company central office designated by the telephone company to serve the geographic area in which the interexchange carrier or other person's point of demarcation is located.").

[47]     Joint Glossary, at 26 (citing 47 C.F.R. § 51.5).

MSC.[48]

The parties dispute AT&T Texas's invoice charges to Affordable for Land-to-Mobile facilities that Affordable ordered outside the serving wire center where AT&T Texas delivers the traffic.   AT&T Texas billed Affordable for the facility costs associated with Land-to-Mobile traffic outside the serving wire center in both the Houston and Austin Local Access and Transport Areas ("LATAs").[49]  For example, in the Houston LATA, AT&T Texas billed Affordable for facilities used to transport traffic from tandem offices in Nacogdoches, Huntsville and outlying areas of Houston to tandems in downtown Houston connected to Affordable's MSC.[50]  These disputed

---

[48]     Pursuant to Section 2.4.1 of the 2007 Agreement, the rates Affordable must pay for facilities purchased from AT&T Texas "are specified in Section 7 of the inter or intrastate special access tariffs."

[49]     "LATAs" are geographic boundaries beyond which AT&T Texas is not permitted to pass traffic.   Within a given LATA, AT&T Texas can provide both local and long distance services.   AT&T Texas may not, however, deliver traffic outside that LATA but must, instead, hand the traffic off to an interexchange (long-distance) carrier for delivery to other LATAs.   *See* AT&T Texas's Motion [Doc. # 42], at 16-17; Joint Glossary, at 12.   There are 17 LATAs within the state of Texas.   Affordable ordered facilities in four of those LATAs:  Houston, Austin, San Antonio, and Corpus Christi.   *See* AT&T Texas's Motion [Doc. # 42], at 8.

[50]     *See* Attachment 1 to Lenhart Decl., at 1.   Affordable argues that he never ordered any "facilities" and that all of the disputed billings pertain to "trunks" and a simple "cross connect" between Affordable and AT&T Texas.   *See* Affordable's Response [Doc. # 45], at 15 n.11.   Affordable does not provide probative evidence supporting this argument.

AT&T Texas's invoices reflect that Affordable was being charged for "trunk groups"
(continued...)

billings are *inter alia* for Affordable's dial-up ISP customers' receipt of land-line calls

from dial-up Internet users in Nacogdoches and Huntsville, which calls had to be

routed over AT&T Texas's trunks to Affordable's MSC that Affordable chose to place

---

50       (...continued)
       used to transport traffic that was outside the serving wire boundary of Affordable's
       MSC. Attachment 1 to Lenhart Decl., at 1. The 2007 Agreement defines "connecting
       facilities" as "dedicated facilities either provided under this Agreement or separate
       contract used to connect [Affordable]'s network and AT&T TEXAS' network for the
       purpose of interchanging traffic." 2007 Agreement, § 1, at p. 2.

       In their Joint Glossary [Doc. # 58], the parties dispute the definition of "facilities."
       Affordable defines facilities as "[a] telephone industry term for a phone or data line.
       Sometimes (but rarely) used to describe equipment." *See* Joint Glossary, at 9 (citing
       NEWTON'S TELECOM DICTIONARY 266 (17th ed. 2001)). AT&T Texas defines
       "facilities" as "equipment that transmit[s] information by electromagnetic means or
       which directly support such transmission." AT&T also notes that "[t]he terms
       'facilities' and 'trunks' are sometimes used interchangeably." Joint Glossary, at 10
       (citing *United States v. American Telephone & Telegraph Co.*, 552 F.Supp.131,
       229-30 (D.D.C. 1982), and *Qwest Corp. v. Minnesota Public Utils. Comm'n*, No.
       04-1164, 2005 WL 1431652, at *1 (D. Minn. Mar. 31, 2005)).

       The parties' Joint Glossary defines "trunk group" as "a set of trunks of common
       routing, origin and destination and which serve a like purpose or function." *Id.* at 24.
       "Trunks" are "circuit[s] between switchboards or other switching equipment, as
       distinguished from circuits which extend between central office switching equipment
       and information origination/termination equipment." *Id.*

       The Court concludes that any distinction between "trunks" and "facilities" as used in
       the 2007 Agreement and AT&T Texas's bills is not material. AT&T Texas is billing
       for the trunks that were used to transport traffic to and from Affordable. Affordable
       does not make the argument that trunks were not intended to be included as
       "facilities" in Section 3 of the 2007 Agreement. Indeed, later in its Response,
       Affordable itself appears to use the terms facilities and trunks interchangeably,
       referencing "facilities/trunks." *See* Affordable's Response [Doc. # 45], at 22, 24 n.19.

in downtown Houston.[51]

Affordable advances two principal arguments as to why he should not have to pay these costs.  First, Affordable relies on *Southwestern Bell Telephone Co. v. PUC*, 348 F.3d 482 (5th Cir. 2003), and the FCC's reciprocal compensation regulations, 47 C.F.R §§ 51.703(b), 51.709(b).[52]   The *Southwestern Bell* case involved an interconnection agreement that was the product of compulsory arbitration under 47 U.S.C. § 252(b).  The Fifth Circuit affirmed the district court's ruling that the FCC's reciprocal compensation rules, 47 U.S.C. § 251(b) and 47 C.F.R. § 51.703, governed the agreement and did not allow the ILEC, Southwestern Bell, to charge the CLEC, AT&T, for traffic originating on Southwestern Bell's network.  Affordable thus argues that federal law prohibits AT&T Texas from charging for trunks that carry AT&T Texas-originated traffic.  Affordable's reliance is misplaced.  Section 3 of the 2007 Agreement, including sections 3.1.2.1 and 3.1.2.2 that require Affordable to pay

---

[51]     Transcript [Doc. # 62], at 25, 32, 39-40, 54, 118, 155.

[52]     47 C.F.R. § 51.703(b) states: "A LEC may not assess charges on any other telecommunications carrier for telecommunications traffic that originates on the LEC's network."  47 C.F.R. § 51.709(b) provides that:

> The rate of a carrier providing transmission facilities dedicated to the transmission of traffic between two carriers' networks shall recover only the costs of the proportion of that trunk capacity used by an interconnecting carrier to send traffic that will terminate on the providing carrier's network. Such proportions may be measured during peak periods.

for the facilities needed to route AT&T Texas-originated traffic outside of the serving wire boundary, was the result of voluntary negotiations under 47 U.S.C. § 252(a), as explained below and thus the authorities on which Affordable bases its argument are inapplicable.

The Federal Telecommunications Act provides two mechanisms for creating interconnection agreements under 47 U.S.C. §§ 251 and 252.  Agreements may be reached by voluntary negotiations or mediation under § 252(a), or may be established by "compulsory arbitration" under § 252(b).  Section 252(a)(1) expressly allows parties to negotiate an agreement "without regard to the standards set forth in subsections (b) and (c) of section 251."  47 U.S.C. § 252(a)(1); *see also Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.*, 350 F.3d 482, 485 (5th Cir. 2003) ("Under the provision for voluntary negotiations, the parties are free to reach any agreement, without regard to the duties set forth in § 251." (citing 47 U.S.C. § 252(a)(1))).  When all or part of an agreement is voluntary, 47 U.S.C. § 252(e)(2)(A) authorizes a state commission to reject the agreement (or any voluntary part of it) *only if*: (i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or (ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity.  *See also* 47 C.F.R. § 51.3 ("To the extent provided in [47 U.S.C. § 252(e)(2)(A)], a state commission

shall have authority to approve an interconnection agreement adopted by negotiation even if the terms of the agreement do not comply with the requirements of this part."). The regulations on which Affordable relies, 47 C.F.R. §§ 51.703(b), 51.709(b), were promulgated to implement the reciprocal compensation provisions of 47 U.S.C. § 251(b),[53] and do not apply to voluntarily negotiated agreements.   47 U.S.C. § 252(a)(1); *Coserv Ltd. Liability Corp.*, 350 F.3d at 485; *Globaleyes Telecomms., Inc. v. Verizon N., Inc.*, 425 B.R. 481, 493-94 (S.D. Ill. 2010) (rejecting, on appeal from bankruptcy court's grant of summary judgment, argument that 47 C.F.R. § 51.709 governed or superseded contract terms that were voluntarily negotiated under 47 U.S.C. § 252(a)(1), and noting that the "contention that every interconnection agreement must comply with 47 C.F.R. § 51.709 is inaccurate.").

Section 25.1 of the 2007 Agreement states that the Agreement was "entered into as a result of both private negotiation between the Parties and arbitration by the Commission."[54]   AT&T Texas has provided uncontradicted evidence that Section 3 of the 2007 Agreement was the result of voluntary negotiations under 47 U.S.C. § 252(a).   The 2007 Agreement Affordable entered into was the same agreement

---

[53]   *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, No. 96-98, 1996 WL 452885, 11 F.C.C.R. 15,499 at *16228-*16229, or at *453-*455 (Rel. Aug. 8, 1996), *reversed on other grounds*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999).

[54]   2007 Agreement, § 25.1.

AT&T Texas first established with its affiliate Cingular Wireless in 1998.[55] When the

parties submitted that agreement to the PUCT, AT&T Texas and its affiliate

represented to the PUCT that "[t]his Agreement constitutes the negotiated contract

between SWBT and a CMRS provider" and is a "bilateral agreement, reached as a

result of negotiations and compromise."[56]   The parties sought approval of the

agreement under the standards for state commission review of voluntary agreements.[57]

The PUCT approved the 1998 agreement under the § 252(e)(2)(A) standards for

negotiated agreements.[58]   In approving the 1998 agreement, the PUCT stated:

"Approval of the Agreement does not constitute Commission determination on

whether or not the terms and conditions of this agreement comply with the

requirements of Section 251 of the FTA [or] the regulations prescribed by the [FCC]

---

[55]   *See* Exh. I to AT&T Texas's Motion [Doc. # 42], at 1 (Affordable's counsel requesting to opt-in to Cingular/AT&T Texas interconnection agreement). *Compare* 2007 Agreement *with* Agreement for Interconnection and Reciprocal Compensation by and between Southwestern Bell Wireless Inc. and Southwestern Bell Telephone Company, Attachment 1 to Joint Application of Southwestern Bell Telephone Company and Southwestern Bell Wireless, Inc. for Approval of Interconnection Agreement, Exh. Y to AT&T Texas's Reply [Doc. # 46], at 9-70.

[56]   *See* Joint Application of Southwestern Bell Telephone Company and Southwestern Bell Wireless, Inc. for Approval of Interconnection Agreement, Exh. Y to AT&T Texas's Reply [Doc. # 46], at 3-4.

[57]   *Id.* at 4.

[58]   PUCT Order dated February 5, 1998, Docket No. 18364, Exh. Z to AT&T Texas's Reply [Doc. # 46], at 4 (approving Cingular/AT&T Texas interconnection agreement under 47 U.S.C. § 252(e)(2)(A), the standard for voluntary agreements).

pursuant to Section 251 of the FTA . . . ."[59]  The 2007 Agreement remained voluntary even when Affordable entered into it; the parties' joint submission requested and obtained PUCT approval under the nondiscriminatory/public interest standards of 47 U.S.C. § 252(e)(2)(A).[60]  Affordable has not provided contradictory evidence and has failed to raise a genuine issue of material fact that the 2007 Agreement was not voluntarily negotiated under § 252(a).[61]  Because the evidence establishes that the Section 3 compensation obligations of the 2007 Agreement were negotiated in 1997 after the pertinent FCC rules implementing § 251(b) were adopted, those terms were voluntary and did not have to comply with 47 U.S.C. § 251(b) and (c).  For these reasons, 47 C.F.R. §§ 51.703(b), 51.709(b), and *Southwestern Bell v. PUC*, 348 F.3d

---

[59]     *Id.* at 5.

[60]     *See* Exhs. EE, FF to AT&T Texas's Reply [Doc. # 46]

[61]     Affordable also relies on Sections 25.1, 25.2, and 26.1 of the 2007 Agreement to argue that federal law does indeed govern the 2007 Agreement.  This reliance is unavailing.  Section 25.1 is discussed in the text above.  Section 25.2 describes a process to amend the contract should a court or regulatory agency determine that modification is necessary to bring the contract into compliance with the Telecom Act. Section 26.1 is a choice of law provision, which provides that Texas law governs except insofar as federal law may control.  These provisions simply do not suggest that Section 3 was not voluntarily negotiated pursuant to 47 U.S.C. § 252(a).

         Further, to the extent Affordable contends AT&T Texas urges that federal law is inapplicable, Affordable misperceives AT&T Texas's position.  AT&T Texas nowhere contends that federal law does not govern the 2007 Agreement.  AT&T Texas's argument is that federal law, specifically 47 U.S.C. § 252(a)(1), expressly allows parties to negotiate an agreement "without regard to the standards set forth in subsections (b) and (c) of section 251."

482 (5th Cir. 2003), which involved an arbitrated agreement under 47 U.S.C. § 252(b), do not apply to the 2007 Agreement provisions at issue here.

Second, Affordable argues that there is a single point of interconnection ("POI")[62] in each LATA and that Affordable is not liable for trunks on AT&T Texas's side of the POI.  It is undisputed that Affordable only has a single POI in each LATA.[63]  Rather, the parties dispute whether Affordable has a contractual right to a single POI without incurring the costs of delivering traffic over AT&T Texas lines to that POI whenever Affordable requires delivery of calls originating outside the serving wire center of the tandem serving Affordable's MSC.  To the extent Affordable argues that it is entitled to a single, cost-free POI pursuant to 47 U.S.C. § 251(b), the reciprocal compensation regulations (47 C.F.R. §§ 51.703(b), 51.709(b)), and *Southwestern Bell v. PUC*, 348 F.3d 482 (5th Cir. 2003), Affordable's reliance on these authorities is misplaced, as explained above, because these authorities are inapplicable.

Affordable also relies on Section 2.2.1.1, Section 2.5.1, and Appendix DCO of the 2007 Agreement to support its argument that it is not liable for transmission over

---

[62]    A "POI" is defined as "a physical location where AT&T Texas and Carrier interconnect which establishes the technical interface and point(s) for operational division of responsibility."  Joint Glossary, at 16.

[63]    *See* AT&T Texas's Reply [Doc. # 46], at 14 ("AT&T Texas is not arguing that Affordable actually *has* multiple POIs in the LATA.").

the trunks on AT&T Texas's side of the POI.  Section 2.2.1.1 provides that Affordable

> may interconnect with AT&T TEXAS' network at any technically
> feasible point.  The parties acknowledge for purposes of this requirement
> that the locations listed in Appendix DCO constitute technically feasible
> points of interconnection for Carrier to pass traffic to AT&T TEXAS for
> transport and termination by AT&T TEXAS on its network or for
> transport to a Third Party Provider.[64]

Section 2.5.1 similarly provides that "Carrier locations listed in Appendix DCO

constitute technically feasible points of interconnection [that] Carrier shall provide for

AT&T TEXAS to pass traffic for transport and termination on Carrier's network."[65]

Appendix DCO lists twenty-nine AT&T Texas tandems in various LATAs throughout

Texas.[66]  Appendix DCO also lists Affordable's five MSCs and provides that "[t]he

F. Cary Fitch d/b/a Affordable Telecom points of interconnection include the

following MSCs and their subtending cell sites."[67]  None of these contract provisions

address cost responsibility.  Rather, these 2007 Agreement provisions unambiguously

authorize locations for Affordable to "interconnect with AT&T TEXAS' network,"

namely, "at any technically feasible point" the parties designate.  Appendix DCO lists

all "technically feasible" points that Affordable *may* select to locate one or more

---

[64]     2007 Agreement, § 2.2.1.1

[65]     *Id.*, § 2.5.1.

[66]     *See* Appendix DCO to 2007 Agreement, at 1.

[67]     *Id.*, at 6.

MSCs or POls.  The portion of Appendix DCO setting out where Affordable has elected to have MSCs, lists five of those locations and makes plain that Affordable is allowed have more.  Appendix DCO thus authorizes Affordable to select additional POIs within any of the serving wire centers from which traffic might originate.  Other sections of the 2007 Agreement, specifically, Sections 3.1.2.1 and 3.1.2.2, as explained above, allocate financial responsibility and impose the financial consequences of Affordable's decision not to select additional POIs within certain LATAs.

Affordable also argues that the facilities it ordered from AT&T Texas to handle traffic from outside the serving wire center to his MSC (*e.g.*, from Nacogdoches or Huntsville to Houston) do not constitute "interconnection" and Affordable should not have to pay for these facilities.  This argument ignores the unambiguous language of the 2007 Agreement, which defines "interconnection" to include "the connection of separate pieces of equipment, facilities, or platforms between or within networks for the purpose of transmission and routing of Telephone Exchange Service traffic and Exchange Access traffic."[68]  Any trunks and facilities Affordable ordered from AT&T Texas to provide service to his customers constitute interconnection because they are "equipment, facilities or platforms between or within network for the purpose of

---

[68]      2007 Agreement, § 1, at p. 3.

transmission and routing of Telephone Exchange Service traffic and Exchange Access traffic."[69]  That Affordable does not have a POI where AT&T Texas has provided dedicated facilities to serve Affordable does not mean that Affordable is not utilizing AT&T Texas's interconnection service.

Based on the foregoing, the Court concludes that the 2007 Agreement requires Affordable to pay AT&T Texas for trunks and facilities that deliver to Affordable's MSC all Land-to-Mobile traffic that originates outside the servicing wire center boundary of the tandem serving Affordable's MSCs.  AT&T Texas provides evidence that the unpaid fees for these services through February 2011, total $1,536,678.00.[70] These fees, and others, are likely still accruing.  For this reason, the Court declines to decide the precise amount owed by Affordable for these or any other charges.  The parties are ordered to determine the precise amounts owed in light of the foregoing ruling interpreting the 2007 Agreement.  The parties must appear for a conference on **July 28, 2011, at 10:15 a.m.**, to discuss this and other matters related to entry of a complete or partial final judgment.

   ***Mobile-to-Land Facilities Charges.*–**  Section 3.1.1 of the 2007 Agreement

---

[69]    *Id.*

[70]    *See supra* note 36 (explaining how the Court arrived at the $1,536,678.00 using AT&T Texas-provided evidence).  In its Response, Affordable states that the amount due is $131,467.00 higher, for a total of $1,668,145.00, but provides no source for that figure.  *See* Affordable's Response [Doc. # 45], at 16.

addresses the parties' responsibilities for Mobile-to-Land traffic, that is, traffic that

originates on Affordable's network and terminates on AT&T Texas's network.

Section 3.1.1 provides:

> 3.1.1  Mobile to Land Traffic
>
>> 3.1.1.1  [Affordable] shall be responsible for the delivery of traffic from its network to AT&T TEXAS' network for the transport and termination of such traffic by AT&T TEXAS to a[n] AT&T TEXAS end user or for delivery by AT&T TEXAS to a Third Party Provider.
>>
>> 3.1.1.2.  Unless [Affordable] elects to provision its own facilities, AT&T TEXAS shall provide the physical plant facilities that interconnect [Affordable]'s network with AT&T TEXAS' network.  AT&T TEXAS shall provision mobile to land connecting facilities for [Affordable] under the terms and conditions specified in Section 7 of the applicable inter- or intrastate access tariff.

As discussed above in conjunction with Sections 3.1.2.1 and 3.1.2.2, "responsible"

means responsible for paying costs of the facilities.  Sections 3.1.1.1 and 3.1.1.2

unambiguously state that if AT&T Texas provides Mobile-to-Land facilities,

Affordable must pay for them under the terms and conditions specified in Section 7

of the applicable inter- or intrastate access tariff.

Affordable disputes AT&T Texas's charges for Mobile-to-Land facilities,

arguing that these trunks are on AT&T Texas's side of the point of interconnection

(the POI) and, under the FCC's reciprocal compensation rules, AT&T Texas's usage charges already encompass those costs.[71]   Affordable argues these costs cannot be "double recovered through 'facility/trunk' assessments."[72]   Affordable provides no evidence or legal authority for its argument.[73]   Furthermore, as discussed above, the FCC's reciprocal compensation rules found in 47 C.F.R. §§ 51.703(b), 51.709(b) do not apply to Section 3 of the 2007 Agreement because it was voluntarily negotiated pursuant to 47 U.S.C. § 252(a).   Affordable's argument is rejected.

Affordable also relies on Fitch's Declaration to argue that there are factual disputes regarding the POI location for Mobile-to-Land trunks in every LATA except Corpus Christi.[74]   Even if there are factual disputes, they are not material here.   The location of an Affordable POI is immaterial to Affordable's responsibility to pay the tariffs charged by AT&T Texas for the AT&T Texas facilities that Affordable ordered for Mobile-to-Land traffic. The plain language of Sections 3.1.1.1 and 3.1.1.2 of the 2007 Agreement says nothing about the location of Affordable's POIs.   These contract

---

[71]   *See* Affordable's Response [Doc. # 45], at 26.

[72]   *See id.*

[73]   In fact, this argument has been squarely rejected by another district court.   *See Verizon N., Inc. v. Telnet Worldwide, Inc.*, 440 F. Supp. 2d 700, 710 (W.D. Mich. 2006).

[74]   *See* Affordable's Response [Doc. # 45], at 26-27 (citing Fitch Second Decl., ¶¶ 20-25).

terms make Affordable responsible for any and all AT&T Texas facilities Affordable ordered to accomplish delivery of Mobile-to-Land traffic originating on Affordable's network.

AT&T states that Affordable owes $41,950 for these charges. Affordable has not disputed that figure and has waived any challenge this regard.

***Two-Way Facilities Charges.*–** Section 2.4.4 addresses the parties' responsibility for two-way facilities, which transport both Land-to-Mobile and Mobile-to-Land traffic. That section provides that "[Affordable] and AT&T TEXAS may share AT&T TEXAS interconnection facilities at the rates specified in Section 7 of the applicable inter- or intrastate special access tariff. Charges will be shared by the Parties based on a proportional (percentage) basis as specified in Appendix PRICING."[75] Section 6.0 of the "Appendix Pricing," which was agreed to prior to commencement of performance under the 2007 Agreement, establishes a sharing ratio of "70% mobile to land and 30% land to mobile," thereby assessing 70% of the cost of a two-way facility to Affordable.[76] Affordable disputes these charges, arguing simply that, under the Agreement and FCC rules, AT&T Texas can assess charges

---

[75]   2007 Agreement, § 2.4.4 (referring to "Appendix Pricing," an appendix to the 2007 Agreement [Doc. # 42-3], at 15-18).

[76]   *See* Appendix Pricing to 2007 Agreement, § 6.0.

only for facilities/trunks on Affordable's side of the POI.[77]   Affordable does not

identify any section of the Agreement that establishes this division of responsibility.

Nothing in the 2007 Agreement makes such an allocation (*i.e.*, restricting AT&T

Texas's charges  for two-way trunks to Affordable's side of the POI).  Nor does

Affordable identify the "FCC rules" on which it relies here.  To the extent Affordable

again relies on the FCC's reciprocal compensation rules, those provisions are

inapplicable to Section 2.4.4 of the 2007 Agreement, which was voluntarily

negotiated.[78]  Affordable's contention flies in the face of the parties' plain language

in their 2007 Agreement, which assigns 70% cost-responsibility for two-way facilities

to Affordable, regardless of a POI's location.  Accordingly, the express language of

the 2007 Agreement establishes that Affordable is liable for 70% of the cost of two-

way trunks between the parties.  Affordable's contentions regarding two-way trunks

are rejected.

AT&T Texas calculates that Affordable owes $73,029.60 for the two-way trunk

---

[77]   Affordable argues that he only has to pay the costs of AT&T Texas-provided facilities
on his side of the POI and that the costs should be adjusted downward to reflect the
assumed percentage of AT&T-originated traffic that flows over those trunks.
Affordable argues it is not responsible for any cost associated with facilities on AT&T
Texas's side of the POI because AT&T Texas instead should only receive reciprocal
compensation to the extent those facilities are being used to terminate mobile-to-land
traffic.  *See* Affordable's Response [Doc. # 45], at 22-23.

[78]   *See* Exh. Y to AT&T's Reply [Doc. # 46] (showing Section 2.4.4 was part of 1998
Cingular agreement that was voluntarily negotiated).

charges.[79]   Affordable has not lodged any dispute regarding that calculation.
Affordable thus has waived any such challenge.

### 2.    Affordable's Usage Charges to AT&T Texas

Affordable seeks to charge AT&T Texas $246,000 in "Usage Charges" for
terminating AT&T Texas-originated traffic.[80]   AT&T Texas argues that virtually all
of this AT&T Texas-originated traffic is wireline calls from AT&T Texas's wireline
customers to Affordable's dial-up ISP customers.  Affordable does not dispute that
these calls are totally wireline calls, *i.e.*, land-to-land traffic.[81]   AT&T Texas argues
that the 2007 Agreement only authorizes Affordable to provide CMRS traffic, which
involves some aspect of wireless service.  As such, AT&T Texas argues that it should
not have to pay Affordable for terminating traffic to Affordable's dial-up ISP
customers because that land-to-land traffic is not authorized under, and thus is a
breach of, the 2007 Agreement.  "A fundamental principle of contract law is that when

---

[79]    *See* AT&T Texas's Motion [Doc. # 42], at 8, and Exh. F thereto.

[80]    As described above, termination charges are "charges for delivery of one carrier's
traffic (calls) to the customers of another carrier.  The latter carrier is the one
assessing the charge."  *See* Joint Glossary, at 22.  AT&T Texas would owe Affordable
termination charges for any Land-to-Mobile calls from AT&T Texas's customers that
AT&T Texas delivers to Affordable and Affordable "terminates" to his customers.

[81]    *See* Customer List, at 2-3; Fitch Depo. at 72-73; Affordable's Response [Doc. # 45]
at 14 (arguing that Affordable "is most certainly 'authorized' to provide service to
ESPs even if no 'radio' is involved."); *id.* at 6-14 (never disputing AT&T Texas's
assertion and evidence that this traffic is wireline or land-to-land traffic).

one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *accord Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006). The Court thus must determine whether the 2007 Agreement authorizes Affordable to transport and terminate wireline calls to its dial-up ISP customers.[82]

Several provisions of the 2007 Agreement make clear that Affordable is permitted under that Agreement to transmit over AT&T Texas's lines only communications that involve a wireless customer. First, Affordable entered into the 2007 Agreement based on its representations that it was "a duly authorized common carrier engaged in providing Commercial Mobile Radio Services ('CMRS') in the State of Texas."[83] The FCC defines CMRS as "[a] *mobile service* that is: (a)(1) provided for profit, i.e., with the intent of receiving compensation or monetary

---

[82]     Affordable argues that this contention—that the 2007 Agreement does not authorize Affordable to transport traffic to ISPs—was not raised in AT&T Texas's Complaint and therefore may not be considered here. The Court disagrees. AT&T Texas is seeking summary judgment denying Affordable's counterclaim that it is owed reciprocal compensation for terminating traffic to its dial-up ISP customers. In AT&T Texas's Answer to Affordable's counterclaims [Doc. # 22], AT&T Texas "denies that [Affordable] is entitled to reciprocal compensation under the interconnection agreement for internet traffic." *See* Counter-Defendant's Original Answer [Doc. # 22], ¶ 144. Accordingly, Affordable was put on notice, as required by Federal Rule of Civil Procedure 8, that AT&T Texas disputed Affordable's charges for terminating traffic to its dial-up ISP customers.

[83]     2007 Agreement, at 1 (Agreement's Recitals).

gain; (2) [a]n interconnected service; and (3) [a]vailable to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or (b) The functional equivalent of such a *mobile service* described in paragraph (a) of this section."  47 C.F.R. § 20.3 (emphasis added).  The FCC defines a "mobile service" as "[a] radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves . . ."  *Id.*  It is undisputed that Affordable does not provide CMRS or wireless service to its dial-up ISP customers.

Second, the parties "agreed to connect their facilities and interchange traffic . . . for the purpose of offering *wireless* to wireline or wireline to *wireless* communications service to their respective end users."[84]  Affordable does not dispute that the calls it terminates to its dial-up ISP customers are wireline to wireline traffic.[85]

Third, Section 3, which sets the terms and conditions for exchange of traffic, references only "Mobile to Land" and "Land to Mobile" traffic.  It is undisputed that the AT&T Texas-originated calls that Affordable terminates to its dial-up ISP

---

[84]      *Id.* (emphasis added)).

[85]      Affordable's Response [Doc. # 45], at 6-14

customers are Land-to-Land calls.[86]   Affordable argues that the references to "Land-to-Mobile" and "Mobile-to-Land" in Section 3 merely denote which network is originating and which network is receiving the call.   While the Court is not persuaded that the provisions in Section 3 are so limited, the fact that Affordable's network is referred to in the 2007 Agreement as "Mobile" supports AT&T Texas's position that the 2007 Agreement only authorizes Affordable to transport mobile, or wireless, traffic.

Finally, it is undisputed that Affordable only has Type 2A interconnection with AT&T Texas,[87] and a Type 2A interconnection is defined in the 2007 Agreement as "[f]acilities which provide a trunk side connection between [Affordable]'s MSC and a AT&T Texas Wireless Tandem."[88] The 2007 Agreement defines "Mobile Switching Center" as "[Affordable]'s facilities and related equipment used to route, transport, and switch Wireless Calls to a from the public switched telephone network."[89]  The 2007 Agreement defines "Wireless Tandem" as "a switching system that provides a concentration and distribution function for originating or terminating traffic between

---

[86]     *Id.* at 6-9.

[87]     *See* AT&T Texas's Motion [Doc. # 42], at 12; Affordable's Response [Doc. # 45], at 20.

[88]     2007 Agreement, § 2.1.2.

[89]     *Id.*, § 1, at p.3.

wireless MSCs and the landline network and has the software necessary to provide wireless interconnection services."[90]  The 2007 Agreement thus clearly contemplates that Affordable's Type 2A interconnection with AT&T Texas would be used to transport wireless traffic.

The Court concludes that these provisions, taken as a whole, unambiguously authorize Affordable to provide only wireless communications through his interconnection agreement with AT&T Texas.

Despite these provisions, Affordable argues that wireline calls to its dial-up ISP customers are "Wireless Calls" as that term is defined in the 2007 Agreement.  The 2007 Agreement defines "Wireless Calls" as "all calls originating from or terminating to the [Affordable] network."[91]  Affordable argues that, because the ISPs are on Affordable's network, wireline calls to the ISPs are "Wireless Calls" under the 2007 Agreement.  Affordable's interpretation would render meaningless many other provisions of the 2007 Agreement establishing that Affordable is only authorized to transport wireless, that is, CMRS, traffic.  The Court construes this provision in context, as a matter of law, to encompass only those calls that terminate to a wireless or CMRS end-user. *See Valence Operating Co.*, 164 S.W.3d at 662 ("[C]ourts should

---

[90]     *Id.*, § 1, at p. 4.

[91]     2007 Agreement, § 1, at p. 5.

examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").

Affordable argues that "The Reciprocal Compensation for ISP Bound Traffic and Federal Telecommunications Act Section 251(b)(5) Traffic Amendment" to the 2007 Agreement ("Reciprocal Compensation Amendment") allows Affordable to transport traffic to all ISPs and requires AT&T Texas to compensate Affordable for doing so. The Reciprocal Compensation Amendment states: "The Parties agree to compensate each other for the transport and termination of ISP-bound Traffic and Section 251(b)(5) Traffic on a minute of use basis, at $.0007 per minute of use."[92] The Reciprocal Compensation Agreement also provides that:

> This Amendment is intended to supercede any and all contract sections, appendices, attachments, rate schedules, or other portions of the underlying Interconnection Agreement that set forth rates, terms and conditions for the terminating compensation for ISP-bound Traffic and Section 251(b)(5) Traffic exchanged between ILEC and CARRIER. Any inconsistencies between the provisions of this Amendment and provisions of the underlying Interconnection Agreement shall be governed by the provisions of this Amendment.[93]

Affordable's argument thus is that it is not limited to providing wireless traffic to CMRS end users and that it is allowed to provide wireline traffic to its dial-up ISP customers because otherwise the Reciprocal Compensation Amendment would be

---

[92]     Reciprocal Compensation Amendment, § 2.2.2.

[93]     *Id.*, § 1.5

read out of the contract.[94]

The Court is unpersuaded. The Reciprocal Compensation Amendment sets an FCC-approved rate the parties may charge each other for ISP traffic covered by the 2007 Agreement. The issue dividing the parties is the scope of ISP traffic authorized under the 2007 Agreement in light of the Reciprocal Compensation Amendment. The Amendment defines "ISP-bound Traffic" as "ISP-bound traffic lawfully compensable under the FCC ISP Compensation Order."[95] The FCC ISP Compensation Order held that ISP-bound traffic was "information access" under 47 U.S.C. § 251(b)(5) and was excepted from the scope of "telecommunications" subject to reciprocal compensation under section 251(b)(5).[96] The only reference to CMRS carriers in the FCC ISP Compensation Order was that its holding "does not affect either the application of [section 251(b)(5)] to LEC-CMRS interconnection or our jurisdiction over LEC-CMRS interconnection under section 332."[97] The FCC ISP Compensation Order thus

---

[94]    *See* Affordable's Response [Doc. # 45], at 8.

[95]    Reciprocal Compensation Amendment, § 1.4. The "FCC ISP Compensation Order" refers to FCC's Order on Remand and Report and Order, In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic, FCC 01-131, CC Docket Nos. 96-98, 99-68 (rel. April 27 , 2001) ("FCC ISP Compensation Order"), *remanded but not vacated in WorldCom, Inc. v. FCC*, No. 01.1218 (D.C. Cir. 2002).

[96]    FCC ISP Compensation Order, ¶ 44.

[97]    *Id.*, ¶ 47.

did not address the question of whether a CMRS carrier could transmit wireline calls to dial-up ISPs.   As such, the definition of ISP-bound traffic in the Reciprocal Compensation Amendment is not persuasive, let alone dispositive, authority supporting Affordable's position.

Affordable also argues the Reciprocal Compensation Amendment allows it to receive AT&T Texas originated calls bound for its dial-up ISP customers, even though they are not CMRS or wireless customers.   AT&T Texas's position is that "the only ISP-bound traffic for which [Affordable] can impose reciprocal compensation charges is ISP-bound traffic that is also CMRS traffic, *i.e.*, traffic routed through his radio towers."[98]   The Court concludes that AT&T Texas's position best accords with the parties' expressed intentions in the  2007 Agreement.  The 2007 Agreement, read in its entirety, only authorizes Affordable to transport wireless CMRS traffic over AT&T Texas's facilities.   Because the traffic Affordable transports to its dial-up ISP customers is purely wireline traffic, it is not authorized under the 2007 Agreement.[99]   Accordingly, Affordable may not charge AT&T Texas for terminating wireline calls

---

[98]     AT&T Texas's Reply [Doc. # 46], at 20.

[99]     The parties each make various arguments concerning whether under federal telecommunications law having a two-way CMRS license allows Affordable to route wireline traffic to its dial-up ISP customers.   Because the Court finds that the 2007 Agreement between the parties does not allow Affordable to do so, the Court declines to reach this broader federal telecommunications law question.

to Affordable's ISP customers.

AT&T Texas contends that it is not liable for the $246,000 in termination charges that Affordable claims.[100]  As earlier noted, "[a] fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *accord Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006).  AT&T Texas admits, however, that "[t]erminating charges are owed by AT&T to [Affordable] for Land-to-Mobile calls that AT&T Texas delivers to [Affordable] and [Affordable] 'terminates' to [its] CMRS customers."[101]  Affordable argues that AT&T Texas admitted that 10% of Affordable's traffic was CMRS traffic, and therefore AT&T Texas cannot dispute 10% of Affordable's billings.  AT&T Texas disagrees.  The Court declines to decide the amount, if any, owed by AT&T Texas for CMRS traffic.[102]

### 3.    AT&T Texas's Breach of Contract Claim

---

[100]    *See* AT&T Texas's Motion [Doc. # 42], at 21.

[101]    *Id.* at 8.

[102]    It is noted that AT&T Texas has presented uncontradicted evidence that it has already paid Affordable $75,157.06 in termination charges, which is well in excess of 10% of the charges Affordable claims for termination services.  Exh. GG to AT&T Texas's Reply [Doc. # 46].  Affordable does not dispute receipt of these payments.  It is unclear why AT&T Texas may not apply some of these funds to the termination charges due.  Thus, Affordable has shown no damages in regard to CMRS termination charges.

In its Complaint [Doc. # 1], AT&T Texas alleges that Affordable breached the 2007 Agreement by failing to pay amounts due for facilities and services provided under the 2007 Agreement as discussed above. The elements of a claim for breach of contract are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 288 (5th Cir. 2004); *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 615 (Tex.App.-Texarkana 2002, pet. denied); *Guzman v. Ugly Duckling Car Sales of Texas, L.L.P.*, 63 S.W.3d 522, 528 (Tex.App.-San Antonio 2001, pet. denied); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.App.-Houston [14th Dist.] 2000, no pet.). It is undisputed that the 2007 Agreement is a valid contract and that AT&T Texas performed by interconnecting with Affordable. Affordable's failure to pay for those facilities and services as required by the Court's interpretation of the 2007 Agreement constitutes a breach of the 2007 Agreement. AT&T Texas has claimed damages as set forth in its invoices, summarized in Lenhart's Declaration, which Affordable has failed to pay to date. AT&T Texas is entitled to summary judgment on its breach of contract claim for unpaid invoices.[103]

In its Motion for Summary Judgment [Doc. # 42], AT&T Texas also contends

---

[103]    The parties will have to determine the precise amounts due on this claim and others noted elsewhere in the Memorandum and Order.

that it is "entitled to a summary judgment holding that [Affordable] breached the 2007 Agreement by misusing the interconnection for calls to ISPs."[104]  In requesting relief, AT&T Texas asks the Court to "grant summary judgment that . . . (4) [Affordable] has breached the contract by misusing the interconnection for land-to-land calls to ISPs and should be ordered to stop using the interconnection for these calls."[105]  Affordable objects that this claim was never raised in AT&T Texas's pleadings and that AT&T Texas therefore cannot seek summary judgment on this claim.  Affordable argues that its breach of the 2007 Agreement by misusing its interconnection with AT&T Texas to service its dial-up ISP customers is wholly unrelated to AT&T Texas's breach of contract claim, which Affordable argues is limited to the claim for unpaid invoices. Affordable is mistaken.  All of AT&T Texas's factual allegations in the Complaint, which included allegations that Affordable was misusing its interconnection to transport wireline traffic to its dial-up ISP customers, are incorporated into AT&T Texas's breach of contract cause of action by reference.[106]  The parties have engaged in full discovery on the factual matters pertaining to the ISP-misuse theory in connection with AT&T Texas's breach of contract claim.  AT&T Texas's breach

---

[104]    *See* AT&T Texas's Motion [Doc. # 42], at 24.

[105]    *Id.* at 25.

[106]    *See* Complaint [Doc. # 1], ¶ 4.18 ("AT&T Texas hereby incorporates by reference the above facts and allegations as if set forth fully herein.").

claim therefore is deemed to encompass its theory that Affordable breached the 2007 Agreement by misusing its interconnection to transmit wireline traffic to its dial-up ISP customers.

The Court's ruling rejecting Affordable's counterclaim for reciprocal compensation under the 2007 Agreement with respect to Affordable's transport of wireline traffic to its dial up ISP customers disposes of this claim as well.  The 2007 Agreement does not permit Affordable to use its interconnection with AT&T Texas to transport wireline traffic to its dial up ISP customers.  That use constitutes a breach of the 2007 Agreement.[107]   AT&T Texas is entitled to summary judgment on this

---

[107]   Subsequent to the briefing and argument on the pending motions, AT&T Texas filed a Motion for Leave to File Supplemental Pleading Under Rule 15(d) [Doc. # 64] ("Motion to Supplement").  Affordable responded in opposition [Doc. # 67] and AT&T Texas replied [Doc. # 68].  The Court concludes that AT&T Texas's Motion to Supplement should be **granted**.

AT&T Texas seeks to supplement its Complaint to allege facts that occurred in June 2011 when Affordable allegedly expanded its ISP business by acquiring telephone numbers previously assigned to Awesome Paging, Inc., a paging carrier AT&T Texas alleges was also misusing its interconnection with AT&T Texas to serve its dial-up ISP customers.

Federal Rule of Civil Procedure 15(d) provides:

On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading

(continued...)

breach of contract claim.

AT&T Texas's Motion for Summary Judgment further includes a request for injunctive relief.[108]   "To obtain permanent injunctive relief, a plaintiff must demonstrate: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

---

[107]   (...continued)
within a specified time.

FED. R. CIV. P. 15(d). The Fifth Circuit has indicated that the same factors that shape a Rule 15(a) inquiry apply to Rule 15(d).  *See Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1194 (5th Cir. 1982) (citation omitted), *vacated on unrelated grounds by* 460 U.S. 1007 (1983); *cf. United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002) ("[C]ourts often simply apply the principles of Rule 15(c) to supplemental pleadings") (citing decisions from Fourth and Seventh Circuits)).  These factors include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments granted earlier, undue prejudice to the opposing party, and futility.  *Chemetron*, 682 F.2d at 1194 (citations omitted).  Leave to supplement should not be granted where a plaintiff attempts to present "new and different cause[s] of action."  *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 226 (1964).  However, if he does not, and if no other "substantial reason" mandates denying leave, the motion should be granted.  *Chemetron*, 682 F.2d at 1194 (citation omitted).

There has been no undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by AT&T Texas.  Affordable's alleged wrongful conduct occurred in June 2011 and AT&T Texas filed its Motion to Supplement on June 23, 2011.  The proposed Supplemental Complaint alleges no new causes of action but, instead, merely alleges new facts based on Affordable's recent conduct in support of AT&T Texas's breach of contract action.  AT&T Texas's Motion to Supplement its Complaint is **granted**.

[108]   *See* AT&T Texas's Motion [Doc. # 42], at 25 (requesting that the Court order Affordable to stop using its interconnection with AT&T Texas to route wireline calls to its dial-up ISP customers).

(3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *ITT Educ. Servs., Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "A plaintiff must allege 'specific facts' to support a finding of irreparable injury." *Id.* The Fifth Circuit has also explained that "[p]ermanent injunctions are never lightly given. They are hedged about with circumspection: to win one, a petitioner must show a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner." *Posada v. Lamb County*, 716 F.2d 1066, 1070 (5th Cir. 1983) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), and *Baldwin Metals Co., Inc. v. Donovan*, 642 F.2d 768, 775 & n.17 (5th Cir. 1981)); *accord Ballenger v. Mobil Oil Corp.*, 138 F. App'x 615, 622 (5th Cir. 2005).      The Court concludes that AT&T Texas is not entitled to a permanent injunction because AT&T Texas has not demonstrated why monetary damages cannot provide adequate compensation for the injury caused by Affordable's wrongdoing. AT&T Texas argues it has no adequate remedy at law to address Affordable's continuing breach of the 2007 Agreement because the 2007 Agreement does not directly impose monetary costs on Affordable for misusing the interconnection to route wireline traffic to its dial-up ISP customers. AT&T Texas also argues that "[p]roving future lost profits

from the business lines that [Affordable's] ISP customers should be purchasing from AT&T Texas or another local exchange carrier 'would be considerably more difficult' and, therefore, injunctive relief is warranted."[109]   The Court is unpersuaded.  AT&T Texas has cited the Court to FCC authority suggesting that an "ISP typically purchases business lines from a LEC, for which [the ISP] pays a flat monthly fee that allows unlimited incoming calls."[110]   AT&T Texas has not shown that, should Affordable continue to breach the 2007 Agreement by transporting wireline traffic to its dial-up ISP customers, it would be sufficiently difficult to prove future lost profits. The Court declines to issue a permanent injunction at this time.

### B.   AT&T Texas's Fraud Claim

In its Reply [Doc. # 46], AT&T Texas indicates that its fraud claim against Affordable is "unnecessary if AT&T Texas obtains summary judgment on its contract claim and establishes non-liability for Affordable's billings" because "the damages

---

[109]   *See* AT&T Texas's Motion to Supplement [Doc. # 64], ¶ 7 (quoting *ICEE Distributors, Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 597 (5th Cir. 2003) (upholding district court's grant of permanent injunction and noting that "[a]lthough Distributors could potentially prove past lost profits enabling it to recover some measure of damages, it would be considerably more difficult for it to prove the amount of damages owed from J&J and Wal-Mart's future sale of the tubes.")).

[110]   *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3690, ¶ 4, 1999 WL 98037 (Rel. Feb. 26, 1999), *vacated on other grounds*, *Bell Atl. Tel. Co. v. FCC*, 206 F.3d 1 (D.C.Cir.2000).

from the fraud are essentially the same as the contract damages and liability."[111]  The Court has granted summary judgment in favor of AT&T Texas on its contract claims and has granted summary judgment establishing that AT&T is not liable for the disputed portion of Affordable's billings.  Accordingly, the Court deems AT&T Texas's fraud claim abandoned with prejudice.

### C.   AT&T Texas's Request for Summary Judgment on Affordable's Other Counterclaims

AT&T Texas also seeks summary judgment establishing "AT&T's non-liability for [Affordable's] counterclaims."[112]  Affordable asserts myriad counterclaims.[113] Specifically, Affordable has pleaded counterclaims for (1) Declaratory Judgment, essentially seeking declarations duplicating the other substantive causes of action; (2) violations of §§ 201, 202, 251(b)(5), 251(e) and 332(c)(1)(B) of the Telecom Act and the associated FCC implementing rules; (3) breach of contract; (4) fraud; and (5) tortious interference.

*Declaratory Judgment Counterclaims.*–   At oral argument, Affordable

---

[111]   *See* AT&T Texas's Reply [Doc. # 46], at 22.

[112]   *See* AT&T's Motion [Doc. # 42], at 1.

[113]   *See* Affordable's Response [Doc. # 45], at 3 ("[Affordable] brought a number of counterclaims.  There were five general categories, and four of them had sub-parts.").

narrowed its claims.  Affordable withdrew its tortious interference claims,[114] and abandoned all its declaratory judgment claims except "the one relating to Affordable Telecom's ability to provide service to ESPs."[115]  The remaining declaratory judgment claim thus appears to be Affordable's request that the Court permit Affordable to service its dial-up ISP customers under the 2007 Agreement.  The Court has already concluded that the 2007 Agreement does not permit Affordable to provide wireline service to its dial-up ISP customers.  As explained above, Affordable's request for a declaration that the 2007 Agreement allows Affordable to provide wireline service, as opposed to wireless service, to its dial-up ISP customers is denied.

**_Telecom Act Counterclaims._**–   Affordable also asserts that AT&T Texas violated various provisions of the Telecom Act by (1) attempting to charge for AT&T-originated traffic, _i.e._, Land-to-Mobile calls; (2) by refusing to set-up a single wireless tandem to serve the entire Houston LATA; (3) by refusing to pay Affordable reciprocal compensation for terminating traffic; and (4) by refusing to perform switch translations/code opening if a carrier that AT&T Texas determines is not a "paging

---

[114]    Transcript [Doc. # 62], at 128.

[115]    _Id._ at 84.  Throughout his briefing and at oral argument, Affordable uses the term Enhanced Service Providers ("ESPs"), which include Affordable's dial-up ISP customers.  The Court can discern no material difference between ESPs and ISPs for purposes of these Motions.

company" has numbers with a "paging distinction."[116] At oral argument, Affordable's counsel recognized that "if the Court were to interpret the Contract to be one by the parties to intentionally diverge from the standards and the Act, it would be difficult if not impossible for us to prevail at the FCC and therefore, many of those causes of action would fall away."[117] This eventuality has now occurred.  The Court has already interpreted the 2007 Agreement to be a voluntarily negotiated contract under 47 U.S.C. § 252(a)(1) that permissibly diverged from the standards in the Telecom Act.[118] The Court further has determined that the 2007 Agreement permitted AT&T Texas to charge for certain AT&T-originated Land-to-Mobile traffic;[119] that the 2007 Agreement did not entitle Affordable to rely cost-free on a single wireless tandem that would serve the entire Houston LATA;[120] and that the 2007 Agreement did not require AT&T Texas to pay Affordable reciprocal compensation for terminating wireline traffic to Affordable's dial-up ISP customers.[121]  Affordable's counterclaims alleging violations of the Telecom Act based on these contract provisions therefore are without

---

[116]    *See* Answer [Doc. # 19], ¶¶ 12.3-12.68.

[117]    Transcript [Doc. # 62], at 87.

[118]    *See* Section III.A.1, *supra*.

[119]    *See id.*

[120]    *See id.*

[121]    *See* Section III.A.2, *supra*.

merit; "[u]nder the provision for voluntary negotiations, the parties are free to reach any agreement, without regard to the duties set forth in § 251." *Coserv Ltd. Liability Corp. v. Southwestern Bell Tel. Co.*, 350 F.3d 482, 485 (5th Cir. 2003).  AT&T Texas is entitled to summary judgment, dismissing these counterclaims.

The Court concludes, however, that AT&T Texas is not entitled to summary judgment on Affordable's counterclaim that AT&T Texas violated the Telecom Act by refusing to perform switch translations/code opening if a carrier that AT&T Texas determines is not a "paging company" has numbers with a "paging distinction."[122] The Court notes that neither party briefed the merits of whether, by requiring Affordable to change the paging designations on its telephone numbers, AT&T Texas

---

[122]     Affordable's counsel explained this counterclaim at oral argument, stating:

> [T]he way things work is a carrier that is a service provider under the FCC Rules, either a Local Exchange Carrier or a CMRS Provider, is entitled to get numbers from the national numbering, get telephone numbers
>
> *   *   *   *
>
> They have specific designations that are used to input into the industry database. They are classified in certain ways. Some of the Affordable Telecom numbers had multiple designations, one of which was paging. What AT&T required Affordable Telecom to do was remove the paging designation from those numbers even though under Affordable Telecom's Licenses, the Radio Licenses, it is authorized expressly to do paging.
>
> *   *   *   *
>
> So we would contend that's a violation of 251(e).

Transcript [Doc. # 62], at 87.

violated the Telecom Act.  AT&T Texas merely sought summary judgment on this counterclaim on the ground that Affordable had not presented any evidence of damages flowing from this conduct.[123]  AT&T Texas has presented no legal authority that evidence of damages is a required element of a claim for violation of the Telecom Act.  In any event, Affordable has provided some evidence that it incurred at least $15,000 in costs from an outside consultant to meet AT&T Texas's request to change the designations.[124]  AT&T Texas has not met its burden to show there is no genuine dispute as to any material fact on this counterclaim, and summary judgment in AT&T Texas's favor is denied.

*Breach of Contract Counterclaims.*–   Affordable also asserts three counterclaims alleging that AT&T Texas breached the 2007 Agreement.  First, Affordable alleges that AT&T Texas breached the 2007 Agreement by sending Affordable bills for facilities and trunks.  As discussed above, the Court holds that

---

[123]   *See* AT&T Texas's Reply [Doc. # 46], at 22 ("[Affordable] also asserts that AT&T Texas has not sought summary judgment on all of [Affordable]'s counterclaims . . . [Affordable], however, has provided no evidence to support any damages associated with these claims other than his $246,666 invoices. . . . Therefore, [Affordable]'s other claims have no evidence to support them. AT&T Texas raised this in its Motion as the basis for establishing non-liability on all of [Affordable]'s counterclaim." (citations omitted)).

[124]   *See* GVNW Consulting Invoices [Doc. # 45-5], at 3-4 (Exhs. 25 & 26 to Deposition of Courtney Spears [Doc. # 45-2]).

AT&T Texas's billings were proper under the 2007 Agreement.[125]   Accordingly, AT&T Texas is entitled to summary judgment dismissing this counterclaim.

Second, Affordable alleges that AT&T Texas has breached the 2007 Agreement by refusing to pay Affordable reciprocal compensation for AT&T-originated traffic that Affordable terminated.  As discussed above, the Court holds that under the 2007 Agreement, Affordable is only entitled to compensation for terminating AT&T Texas originated calls to his CMRS, *i.e.*, wireless, customers.[126]   AT&T Texas has paid more than Affordable concedes is due under the Court's interpretation of the 2007 Agreement, and thus Affordable has not shown any damages on this breach of contract claim[127] and it is dismissed.

Affordable finally alleges that AT&T Texas breached the 2007 Agreement by refusing to perform Switch Translations/Code Opening unless Affordable changed the designation of its type of numbers from "paging" to a designation that AT&T Texas prefers.  Neither party briefed the merits of the issue of whether AT&T Texas violated the 2007 Agreement by requiring Affordable to change the paging designations on his telephone numbers.   Rather, AT&T Texas sought summary judgment on this

---

[125]     *See* Section III.A.1, *supra*.

[126]     *See* Section III.A.2, *supra*.

[127]     *See* note 102, *supra*.

counterclaim solely because Affordable had not presented any evidence of damages associated with this conduct.[128]  As noted above, Affordable has presented evidence of expenditures associated with making these requested changes,[129] and summary judgment on the ground asserted by AT&T Texas is denied.[130]

More fundamentally, however, neither party has pointed the Court to a contract provision directly addressing this issue.[131]  The Court therefore questions whether this counterclaim is viable, but does not reach that issue.

***Fraud Counterclaims.–***   Finally, Affordable asserts two counterclaims for fraud.  First, Affordable alleges that AT&T Texas made misrepresentations regarding its intent to correct certain billing errors, namely, that AT&T Texas represented that it would stop assessing charges related to facilities and trunks in the San Antonio LATA and that AT&T Texas would issue credits to that account.  At oral argument, counsel for Affordable indicated that AT&T Texas had represented that these billing errors had been fixed, that Affordable was trying to verify the status of these billings.

---

[128]   *See* AT&T Texas's Reply [Doc. # 46], at 22.

[129]   *See* note 124, *supra.*

[130]   To expedite final resolution of this case, AT&T Texas may choose to withdraw its opposition to this claim and other unresolved counterclaims Affordable asserts.

[131]   *See* Transcript [Doc. # 62], at 88 (Affordable's counsel noting "[a]nd then there is the switch translations issue. We put it as part of the breach of Contract, but frankly, we've had a really hard time finding any place in the Contract that [it's] addressed").

Affordable's counsel stated that if AT&T Texas had fixed the problem, then this fraud claim would be dropped.[132]   The Court declines to rule on this counterclaim, as it appears moot.

Second, Affordable alleges that AT&T Texas representatives committed fraud in 2004, when Affordable initially sought to interconnect with AT&T Texas under its one-way CMRS license.[133]   Specifically, Affordable alleges that AT&T Texas representatives Jack Cutting and Veronica Wyant represented to Affordable in March 2004 that unless trunks were established to two wireless tandems in the Houston LATA and to wireless tandems in Huntsville and Nacogdoches, calls from end-users in Huntsville and Nacogdoches addressed to Affordable's customers would "not complete."   Affordable alleges that these representations were materially false. Affordable alleges that it relied on this representation and therefore established trunks to multiple wireless tandems in the Houston LATA.[134]   At oral argument, Affordable indicated that this fraud claim was "largely defensive in nature" in that "under [Affordable's] interpretation of the Contract, Affordable Telecom does not owe for the billings . . . [but] even if we do, we built [the network] this way because [AT&T

---

[132]     *Id.* at 129.

[133]     *See* Section I.B, *supra* (explaining prior dealings between the parties).

[134]     *See* Affordable's Answer [Doc. # 19], ¶¶ 11.42-11.45.

Texas] told us we had to."[135]

"A plaintiff seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, __ S.W.3d __, 2011 WL 1226100, at *18 (Tex. Apr. 1, 2011) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990), and *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983)). "[J]ustifiable reliance comprises two elements: (1) the plaintiff must in fact rely on the information; and (2) the reliance must be reasonable." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 501-02 (5th Cir. 2000) (citing *Scottish Heritable Trust PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 615 (5th Cir. 1996)). "[A] fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations." *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)); *see also*

---

[135]    *See* Transcript [Doc. # 62], at 131.

*U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000) ("When experienced executives represented by counsel voluntarily sign a contract whose terms they know, they should not be allowed to claim fraud in any earlier oral statement inconsistent with a specific contract provision." (citation omitted)).

> The 2007 Agreement contains a merger clause which states:
>
> This Agreement together with its appendices and exhibits constitutes the entire agreement between the Parties and supersedes all prior discussions, representations or oral understandings reached between the Parties.  Appendices and exhibits referred to herein are deemed attached hereto and incorporated by reference. Neither Party shall be bound by any amendment, modification or additional terms unless it is reduced to writing signed by an authorized representative of the Party sought to be bound.[136]

The merger clause makes clear that the terms of the 2007 Agreement supersede "all prior discussions, representations or oral understandings reached between the Parties." Moreover, the terms of the 2007 Agreement make clear that "[Affordable] may interconnect with AT&T Texas's network at any technically feasible point,"[137] that "the locations listed in Appendix DCO constitute technically feasible points of interconnection for [Affordable] to pass traffic to AT&T Texas,"[138] and that

---

[136]    2007 Agreement, § 35.

[137]    *Id.*, § 2.2.1.1.

[138]    *Id.*  Appendix DCO lists nine AT&T Texas tandems in the Houston LATA, which tandems, according to the 2007 Agreement, constitute the "technically feasible (continued...)

"[Affordable] agrees to interconnect to at least one AT&T Texas facility in each LATA in which it desires to pass traffic to AT&T Texas."[139]  These terms explain how Affordable could have chosen to set up its interconnection in the Houston LATA and supersede any 2004 statements by AT&T representatives.  Affordable's fraud claim based on the 2004 statements is defeated by the 2007 Agreement's merger clause.  AT&T Texas is entitled to summary judgment on Affordable's fraud counterclaim

## IV.    AFFORDABLE'S MOTION

Affordable seeks summary judgment (1) denying AT&T Texas's requests for Declaratory Judgment in ¶ 4.5 of the Complaint; (2) denying AT&T Texas's fraud claim in ¶ 4.15 of the Complaint; (3) denying AT&T Texas's claim in ¶ 4.11 of the Complaint that Affordable violated the Telecom Act ; (4) denying AT&T Texas's quantum meruit claim in ¶ 4.23 of the Complaint; (5) and granting Affordable's Counterclaims for Declaratory Judgment found in ¶¶ 12.2 B-12.2.E of the Answer.[140]  AT&T Texas has withdrawn its claims for declaratory judgment, violations of the

---

138    (...continued)
points" where Affordable could have chosen to interconnect.  *See* Appendix DCO to 2007 Agreement.

139    *Id.*, § 2.2.2.

140    Affordable's Motion for Partial Summary Judgment [Doc. # 43], at 3-5.

Telecom Act, and quantum meruit.[141]   Additionally, as stated above, the Court has

deemed AT&T Texas's fraud claim as abandoned with prejudice.[142]   The Court

declines to address whether Affordable is entitled to summary judgment on claims that

have been withdrawn or abandoned by AT&T Texas.

Affordable seeks declarations that:

B.   [S]ince Affordable Telecom does provide CMRS service that includes telephone exchange and/or exchange access service, Affordable Telecom is also allowed to provide telecommunications service to other customers, Internet Access providers and other information/enhanced service providers, and is allowed to do so "through" the interconnection arrangement with AT&T Texas.

C.   [S]ince Affordable Telecom does provide CMRS service that includes telephone exchange and/or exchange access service, Affordable Telecom is also allowed to directly provide information/enhanced services, and is allowed to do so "through" the interconnection arrangement with AT&T Texas.

D.   [S]ince Affordable Telecom does provide CMRS service that includes telephone exchange and/or exchange access service, Affordable Telecom could – if it chose to do so – provide Internet Access service to customers "through" the interconnection arrangement with AT&T Texas.

E.   Based on the contract terms, AT&T Texas owes intercarrier compensation at the FCC-prescribed rate of $0.0007 per minute of use to Affordable Telecom for all § 251(b)(5) traffic that originates on

---

141   *See* AT&T Texas's Response to Affordable's Motion for Partial Summary Judgment [Doc. # 44], at 2 (withdrawing claims for quantum meruit and violations of the Telecom Act); AT&T Texas's Reply [Doc. # 46], at 22 (withdrawing *inter alia* claims for declaratory judgment, violations of the Telecom Act and quantum meruit).

142   *See* Section III.B, *supra*.

> AT&T Texas' network and is delivered to Affordable Telecom for termination to the called party serviced by a telephone number assigned to Affordable Telecom from the National Numbering Administrator, or ported to Affordable Telecom under the national porting rules. Specifically, but without limitation, AT&T Texas owes Affordable Telecom intercarrier compensation for the "ISP-bound" traffic that Affordable Telecom terminates to an ISP.[143]

At oral argument, Affordable abandoned all of its declaratory judgment claims except "the one relating to Affordable Telecom's ability to provide service to ESPs."[144]  It is not clear exactly which of these counterclaims Affordable intended to abandon at oral argument since the declarations requested paragraphs 12.2B-12.2.E all relate to Affordable's ability to provide service to ESPs or ISPs.  Affordable, however, is not entitled to summary judgment on any of the requested declarations.

The Court has already concluded that the 2007 Agreement does not permit Affordable to provide wireline service to its dial-up ISP or ESP customers. Accordingly, the Court has concluded that the 2007 Agreement does not require AT&T Texas to pay reciprocal compensation to Affordable for terminating wireline traffic to its dial-up ISP customers.  For the reasons stated above, any request for a declaration that the 2007 Agreement allows Affordable to provide wireline service,

---

[143]   Affordable's Motion for Partial Summary Judgment [Doc. # 43], at 4-5 (citing Answer [Doc. # 19], ¶¶ 12.2.B-12.2.E).

[144]   Transcript [Doc. # 62], at 84.  At oral argument, Affordable's counsel explained that ISPs are a subclass of ESPs.

as opposed to wireless service, to its dial-up ISP customers is denied.  Summary judgment on Affordable's declaratory judgment counterclaims is denied.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED** that AT&T Texas's Motion for Summary Judgment [Doc. # 42] is **granted in substantial part and denied in part.**  It is further

**ORDERED** that Affordable's Motion for Partial Summary Judgment [Doc. # 43] is **denied**.  It is further

**ORDERED** that Affordable's Motion to Strike New Evidence and Arguments Raised in Plaintiff's Reply, or Alternatively Motion for Leave to File Sur-reply [Doc. # 49] is **granted in part and denied in part**.  It is further

**ORDERED** that AT&T Texas's Motion to Supplement [Doc. # 64] is **granted**. It is further

**ORDERED** that the parties must make every good faith effort to immediately negotiate and resolve the open claims and outstanding monetary issues (including providing updated figures) in this case so final judgment may be entered promptly. The parties must appear for a conference on **July 28, 2011, at 10:15 a.m.** in Courtroom 9F of the United States Courthouse at 515 Rusk, Houston, Texas., to discuss entry of a complete or partial final judgment.

SIGNED at Houston, Texas, this **22nd** day of **July, 2011**.

_____
Nancy F. Atlas
United States District Judge